Council, for the appellate, please identify herself, tell us who she represents. I'm Kathleen Moran. I represent Daniel and Marie Alvarez, who were the debtors in this matter, and were the homeowners out of which this Rule 3002.1 matter arose. And how much time would you like to reserve for rebuttal? Five minutes. Please proceed. This is a request to the Court to provide us with some guidance about the nature of the information that a holder of a claim secured by the debtor's principal residence has to supply at the end of the case to support their contention that the loan is something other than fully current. The rule requires them, over time, to file notices of payment change, notices of fees and expenses, and then to respond at the end of the case to the notice of final cure payment. And if they think it's not current, to itemize the reasons that they take that position and allow the debtor to know at the end of the case where they stand with the mortgage. And this case turns on the nature of the information that was provided in the servicer's response, which we contend was inaccurate, incomplete, and most importantly, incomprehensible. Well, I think that's where you are, really. Is it incomprehensible? Because at the end of the day, it wasn't inaccurate or incomplete. It just was hard to figure out, which is often the case in these notices that we've all seen as bankruptcy judges. So the question for you, really, is who has to pay for the cost of figuring that out? That's exactly my position. And the experience in this case, on the face of it, the first couple of lines in the offered payment history failed to credit two payment the first two checks that the debtors made postpetition, copies of which were supplied in the motion. They don't appear. One of them appears and is reversed out, and the second doesn't appear anywhere with a date that can be traced to the check. So we all agree that everybody, including the lawyer representing the bank, when you had that long hearing before Judge Hammond, and you went through painstakingly what was each line, that it was difficult to figure out. So the question is, really, under the rule, why, when it's really a discretionary right of the judge to award fees or not, why we should do that and what the rule should be? I don't see that there could be a bright-line rule, when, who has to pay for what, because you've got a situation where parties are negotiating, going through the process, and often informally, rather than in front of the judge. And so what should the rule be? I think the rule has to be that the information be accurate and accessible. But isn't that, in the eye of the beholder, I mean, accurate is accurate, but accessible, you know, I mean, there's got to be, it's a scale, right? It's not going to be a hard and fast rule that we could say, in this case, yes, no, always this, never that. And I think that the judge applied the wrong rule when she said, I can't find that it was inaccurate. But it wasn't inaccurate. It was accurate, but hard to figure out. But it seems to me that if it doesn't post the canceled checks that we showed, that it is inaccurate. It came to the right number or a number that's close enough for government work at the end of the day. But the, it seems to me the purpose of the rule is for transparency. And so the debtor knows. And I can tell you that it took me about six hours to compare the notices of payment change with the payment history to try and track the checks for which I had the canceled checks and couldn't find them in the entry. So I don't believe that there is a single bright line. But certainly on these facts, I think both the payment history was inaccurate in that it didn't post in visible ways payments the debtor knew she'd made. If it came to the, let me change it around a little bit. Let's suppose you were, you want guidance. Okay, so let's suppose, how would you write a rule to give people guidance, mortgage servicers guidance about how clear these statements have to be? I mean, putting aside the accuracy point, putting aside the completeness point, just focus on the clarity and how would you articulate a rule? Well, and it probably takes more than off the top of my head. But the inability, the debtor ought to be able to match their records with the proffered records from the servicer. So I've got to go. But that happened eventually, right? No, I think that what we found deep in the bowels of the history was adjusting entries that didn't reference the canceled check, but that got the number to something close to the right number. But there was no way, absent the explanations proffered at the hearing from counsel, to find those adjusting entries, and we had to take his assurances that that entry really fixed the lack of the appearance of the check received on a given date as shown. So maybe one aspect of the rule you were talking for is there ought to be an entry for every check tendered by the debtor, every payment tendered by the debtor. Yes, and what we see repeatedly is you see the check, the receipt of it acknowledged, and then it's reversed, and there's no way often to find it. If it's ever been reapplied, you can't find it. I mean, a lot of the problem seems to me stems from the practice of these suspense accounts. You know, if there's a short payment, they put it in suspense until there's a full payment, then they pull it out. I actually looked at the note in the deed of trust in this case. I'm not sure that's even authorized. I'm not sure that's legitimate practice. Excuse me, that's a big part of this. And it's a profound problem, not just in this case, but I've seen it in far worse instances where in the Howard case we ended up with $101,000 in suspense that the servicer couldn't bother to apply. On the other hand, I've seen other notes that specifically say if there's a short payment, you put it in suspense until there's enough in suspense to make a full payment. So that wouldn't be a complete answer either. You know, and if this — it seems to me that the servicer has to provide something that the debtor can square up with the record. It shouldn't have taken, you know, in the perfect world in compliance with everybody's responsibilities, it shouldn't have taken an experienced lawyer, as long as it took me, to figure out where the two histories differed. And this was complicated further by the fact that their notices of payment change didn't track the amount they said was owed on each given month, or it's not that every month was out, but what they said in the payment history about what the monthly payment for a given month was often didn't square with what the record said on the month was. Eventually they showed they adjusted to correct that problem, right? And they, yeah, they'd made some problems. And for Pete's sake, a footnote, you know, it doesn't have to be just a spreadsheet. They could have made it accessible and comprehensible by an exhibit, a footnote, something or other. But the attitude seems to be if we regurgitate what our accounting systems show, that's sufficient. Well, they could have provided information in machine code, and it would have been information, but it wouldn't have been information that humans could interpret. So I think the purpose of the rule is perverted if it's sufficient to come to the right number but not show your work in a way that the debtor can say, yeah, I see that every payment I made was credited, and I see where I missed a payment. And it seems to me it's not unreasonable if they're in the business of collecting money and accounting for it that this rule is instituted so that the debtor can know what it is they're dealing with and can, again, have some confidence in their And the first two inaccuracies that we found destroyed any confidence that their number was correct. And it wasn't until we filed the motion, we got the response, we had the hearing that we got some kind of oral history that helped. You have five minutes. I will recede here. Counsel, introduce yourself. Tell us who you represent. Good morning, Your Honors. It might please the Court. Lior Katz, appearing on behalf of Bayview Loan Servicing, servicing agent for the Bank of New York Mellon as trustee. And, Your Honor, I just wanted to begin with what is the issue before this Court. The issue before this Court is an order denying the motion for attorney's fees that came as a result of another motion dealing with 3002.1. Here the issue is whether the Court or the lower court abuses discretion when it denied those attorney's fees. The Court here went through extensive hearings and a review of the file. We've had some communication following the filing of the motion. We did, as counsel, try to figure out what issues remained, even after the lengthy hearing with the lower court on November 30, 2017. As of the date of the hearing on the motion for attorney's fees, we did not have any idea what the remaining issues were. After the lengthy hearing on November 30, 2017, with the court where she reviewed the motion and went through the histories, the court asked us to go back and review everything that was said and come up with what is the remaining issues so she can rule on them. Those remaining issues were never communicated to us. And so the court never had a finding of any inaccuracy or inconsistency with our payment history that we provided. Isn't there something fundamentally wrong when an experienced bankruptcy judge and a couple of experienced attorneys have to spend that much time figuring out what's going on with these records? Isn't that a fundamental problem? Yes. That is an issue. But this is the problem that we are facing with at least this case. Our client, Babylone Servicing, did not service a loan from the time of the filing of the bankruptcy. The prior servicer was— That's also not the debtor's fault, right? Right. Correct. But when our client files a response to notice from a QR on the penalty of perjury, they can only reflect what they have in their records as what payments they received, how they were applied. The way our payment history that we put forth, along with the response to notice from a QR, we listed the way Bank of America had it in their system and what was provided to our client, because that's the only thing we can do on the penalty of perjury. Or that's what a client can do. But your client bought the debt, and they bought it the way it was. So if you can't substantiate, you know, the payments, then you shouldn't get credit for them. You know what I'm saying? So the issue here is that everything was substantiated. It was not clear, at least as far as the two payments in the beginning of the case. But there was never a finding, and I think ultimately it was all—all parties agreed that there was nothing wrong in our accounting. The two payments that they mentioned, yes, they were not reflected like they should have been. They should have been reflected as though what the payment amount was, how they were received, how they were applied. That doesn't mean that the payments were not accounted for. Every single payment was accounted for, and that's why we have that stipulation later on that agrees with all of our numbers. Right, but okay. So you've agreed what the numbers should be. That's fine. But it took time and effort to get there, and the information was within your control, not the debtor's control. So why should the debtor have had to file the motion and bear the cost of figuring out your client's incomprehensible numbers? Why shouldn't there be fee shifting here, and why shouldn't, you know, your client bear that risk? What we argued in the lower court, and that's what I'm going to argue again today, is before the motion was filed, there was zero attempts made by the debtor to try to reach out to us and get a clarification. And that's what I indicated to the lower court as well. I had no problem sitting on the phone for as long as it would take to go over the accounting and try to figure out a way where everything was clean. And if I had to make a vision to the response to the NOS Final Cure or the post-petition payment that was filed with the court, we would have done it. We would have no problem doing an amended response to the NOS Final Cure. There is one argument in the opening brief that the debtor didn't have time to basically reach out to us and try to figure out the matter because there's a 21-day rule for them to file one of these motions. Now, we would have had no problem to stipulate to an extension of that deadline, and I don't think there's anything that doesn't allow the parties to stipulate to an extension of that deadline. We would probably have no problem with it because I don't see why we would. The idea is to avoid the attorney's fees by trying to resolve these matters. And I think— Well, there'd still be an attorney's fees if you're spending, as you said, as much time as is necessary on the phone to fix these things. I mean, the only way to avoid the attorney's fees is to have the accountings clear to a reasonably intelligent person. I agree. This is the other problem, and it leads me to another problem. How does a lender control what's clear to the other party? I understand that not—you know, the accounting here could have been a little clearer. I don't think there's any argument about that. I wouldn't be arguing in front of the lower court. I said the exact same thing. Don't call them the lower court because— I apologize. When we go in the next room, we're the lower court. Sorry about that. Judge Hammond. I apologize. No need to disrespect. So we would have had—so when we presented the payment history, we can only do our best to present an illegible payment history. When we get the payment histories from our clients, and I think a lot of lenders work this way, they give electronic payment histories that are very difficult to read. And those are not filed with the courts because the debtors would have a lot of problems interpreting those payment histories, and that's why we don't use them. Because it's a lot easier for a servicer—not to say that it's the right thing to do. It's a lot easier to just print one of these payment histories, attack it as a response to an unsubstantiated claim, and let the debtors deal with it. That's not how it works. This ledger was hand-drafted by someone who sat there and made sure that everything is in columns. Everything shows date received, date applied, amount of payment, suspense, balance. They did their best. And so that's where we get to the court, the Judge Hammond. She had discretion after reviewing everything to determine if attorney's fees were appropriate here. She went through everything, and she said that because she didn't find any inaccuracies, there was no reason to award attorney's fees. And I read the statute again and again and again, and I'm looking at subsection G requires the servicer to file a response to an orders for a timely response. We did that. There is no doubt about it. Now, the 3002.1 allows two things. If a creditor does not file the response to an orders for a final cure, you can go and seek sanctions. They include attorney's fees. If the creditor does file it, the debtor is allowed to file a motion, which they did in this case, and this is, I'm quoting from the statute, to determine if the debtor cured the default and paid all post-petition arrears. There is no mention in subsection I or subsection H that a debtor will be entitled to attorney's fees for bringing up a motion under subsection H. No mention in the statute. Other courts, and there's a lot of mention of In re Howard, which is something the Judge Hammond mentioned in a ruling and as well as in the opening brief, and In re Howard is a ruling by Stephen Johnson where the court essentially awarded attorney's fees when a creditor filed a response to an orders for a final cure. But there's three distinguishing factors. In that case, there was no itemization at all, no itemization to any of the three responses to an orders for a final cure that were filed. Here, we included itemization in both of the responses we filed. Then, each one of the three responses they filed, they — What exactly is the — the rule doesn't say what the itemization is. I mean, how little can you get away with and still be itemized? Right. The way we've been treating it at least is we file a payment history that tries to be as clear as possible because the other way to do it would just put it in a sheet and say what charges are made, and I think that's going to be a lot more difficult for debtor to read and the bank to figure that out. The statute is not clear about what itemization is needed, but we deal with what we have and we've been filing payment histories. And we don't see these motions come very often. A lot of times they're resolved before a motion is filed, and a lot of times the parties agree on the numbers. But, you know, I just want to go back to Inouye Howard because that's something that was hammered on in the opening brief and discussed in the lower court. And, you know, Inouye Howard, in addition to the responses not including payment histories, there was also the amounts. The amounts they listed varied greatly. In our case, we filed the original response and then an amended response about two weeks later. The only difference between the two is $12.77. There's no other responses that were filed. That is the difference. Then the third difference with Inouye Howard case is that the creditor never opposed the motion for attorney's fees, and here we obviously did oppose the motion for attorney's fees, and that's why we're before this court. So we just don't think any reliance on Inouye Howard would be applicable here and should be used here. And so just unless there are other questions, I mean, I can address them. There is just one more thing, actually, that I want to touch on. It's the payment change notices. There was mention of failure to notify the debtor of any payment changes. Again, as we indicated to Judge Hammond in the hearings, we didn't dispute that there were no notice of payment changes filed by the prior servicer. The only way for our client to correct it once they get the loan is to issue the debtor's credit because that way they're not prejudiced. And so all of these credits were issued before this motion came to light. These were not the result of the motion. And so really when you look down at the motion and you look to see what it did, and I mean, yes, they got a hearing with clarification about it. That could have, like I said, been resolved before the hearing. But other than that, there was no change to any of our responses. The amounts stayed the same. We didn't admit to any fault. There was no finding by Judge Hammond that we actually faulted in drafting the response and payment history. And so without Your Honors, unless there are other questions. Thank you very much for your presentation. Thank you, Your Honors. Kathleen Moran. Four minutes and 55 seconds. It's my position that the rule that we're talking about does not require inaccuracy to entitle, to empower the court to shift the cost of the expense. It says if the claim holder fails to supply any information, the court may, and then lists the alternative choices. So I think the judge erred in saying, in basing her denial of some fee shifting here on the need to find that it was inaccurate. And if she could read that payment history and the canceled checks and not say that it was inaccurate, then these words mean different things to different people. Let me ask you this. I think the rule that comes closest to requiring a payment history is the sentence that says the statement shall itemize the required cure or postpetition amounts, if any, that the holder contends remain unpaid as the date of the statement. Does that really require a payment history or just a bottom line total of the amounts unpaid as of the effective date of this notice? I think the fact that they use the word itemize calls for detail. It doesn't say the bottom line. And let's go back to the purpose of the rule is for the debtor to assess whether that number bears any relationship to their records. And the problem in this case was that maybe they came to the right number at the end of the day, but they didn't provide, they didn't itemize it in a way that the debtor could have confidence. And if they can simply throw out information that is incomprehensible, then the debtor has to make an economic decision about to roll the dice. You know, am I going to challenge this and insist on some explanation for what I'm looking at, or is it too expensive for me to insist on accuracy and transparency? The question that comes to my mind, I think comes to other panelists' mind, is why this case? I know this is an issue that you're concerned about, but here we have a case in which the lender has been reasonably accommodating, has responded to your inquiries, has made some adjustments based upon your complaints. How does this become the vehicle for raising this issue? I must commend my opponent. They have been reasonable, they've been forthcoming, but it wasn't until we get to a hearing, when I've teed it up and itemized all the discrepancies, that we start to get some information that helps. And I'm 69. My window for solving these problems is narrow. And if the judge believes that the accounting can be incomprehensible, but as long as it's not inaccurate, then other people or other cases are going to experience the same thing that the Alvarezes did when they get a bill that says that you're $26,000 behind, but we don't show that we've credited your payments. So that's why this case. Last year I had a case where two attorneys came to ask for like $15,000 for producing the document that we're talking here today. A senior partner had assigned these two young lawyers the task of determining the principal balance on a real estate contract for which they had not maintained records for about ten years. And so these two young lawyers sat down and started doing the math, and it took them one week working full time to produce the document, and then they put in their fee bill and they said, well, you know, usually the bank produces this for about, you know, $100. So I don't know how I can give you $15,000 for doing it. But there's some decision-making that's involved in the preparation of these documents. We always think it's just mathematics, but it's not just mathematics, as Judge Ferris has put out. You make decisions about suspense accounts, when to apply, when not to apply, and it produces a different number. You know, and it seems to me there has to be an incentive. I mean, the fact that my opponent is reasonable is, you know, the cherry on top of the sundae here. But the bottom line is my client couldn't look at this payment history and have any confidence in it. But doesn't this cut both ways? In my experience in these issues, it's frequently the debtor who's got the problem with the accounting, not the bank. They're claiming payments that they didn't make. Or do you want your clients exposed to attorney fees for misrepresenting their payment history? If it's intentional, I wouldn't feel like it was unjust. Most of these people are struggling to manage their lives in general. But that isn't the case here. And it seems to me there isn't a bright line, and the court clearly has discretion if that's what they found. But the fact that Judge Hammond and presumably her staff labored as long and as hard as the two of us did and we still left that courtroom having only the oral assurances of counsel that he had explained away the fact that we couldn't find the canceled checks that we had in hand. I just think there has to be a financial motivation. We understand your position. Thank you for your submission today. Thank you. Ms. Diamond-Dumas is submitted. We're out of here. All rise for the winner.
judges: Kurtz, Faris, Brand